**LAW OFFICE OF SAM A. SCHMIDT**
**115 BROADWAY Suite 1704**
**NEW YORK, N.Y. 10006**
**(212) 346-4666**
**FACSIMILE (212) 346-4668**
**E-mail lawschmidt@aol.com**

**Sam A. Schmidt, Esq.**

April 15, 2020

Honorable Richard M. Berman
United States District Judge
500 Pearl Street
New York, NY 10007

Re: *United States v. Terrance Morgan*
19 Cr. 209 (RMB)

Dear Judge Berman:

I am submitting this letter in reply to the government's April 13, 2020 letter. More specifically, I wish to clarify that Terrance Morgan is not attempting to shift blame, downplay the seriousness of the offense or his culpability for his conduct. What I did attempt to do was it make it clear that both Mr. Morgan and his co-defendant had no role in organizing or planning the scheme, obtaining the bank information, were unfamiliar with how the scheme could be accomplished, assumed that the person who planned and organized the scheme made contact with the undercover and gave him Mr. Morgan's telephone number. Neither Mr. Morgan or Kamara had no discretion or decision making authority.

I have been informed that the government's submission was prepared by AUSA Sobelman. Apparently, he was not informed of my conversation with AUSA McLeod in the first month or so after Mr. Morgan's arrest. That conversation included possible dispositions and included my informing the government that Mr. Morgan did not know the real identity of the person who he believed organized the scheme including supplying the bank information. I also told AUSA McLeod that the only information Mr. Morgan had to identify the organizer could be found in his mobile telephone which the government had already seized. Because I believed it was significant that Mr. Morgan is of Liberian heritage and the organizer was Nigerian, I recall mentioning that fact to

Ms. McLeod.[1] Both my notes and recollection reflect that Mr. Morgan told me of the Nigerian's role in our first conversation about the offense.[2]

The purpose of noting this discussion with Ms. McLeod was to demonstrate that from the very beginning Mr. Morgan made it clear that though he voluntarily and intentionally involved himself in a crime he knew was wrong that he not only was not the planner or organizer of the scheme but took directions from the organizer, and as I will demonstrate, from the undercover agent ("UC") after the UC contacted Mr. Morgan.

As a result of the government's submission, I have again reviewed the recorded telephone conversations of Mr. Morgan provided in discovery. The calls clearly demonstrate that not only Mr. Morgan follow the instructions given to him by the organizer, but from when the UC first contacted him, it was the UC explaining and instructing Mr. Morgan what was going to happen and what Mr. Morgan needed to do. [3]

In the first conversation, when the UC called Mr. Morgan on January 5, 2019, it was clear that the UC was in charge and Mr. Morgan did not know what to do except to provide the account information to him. Mr. Morgan had no idea what an "operating account" was or that the owner of the account was a law firm. He thought it was a "corporation" because it included LLC in its name.[4]

---

[1] It is my experience as well as my understanding based upon discussions with Ms. McLeod and other prosecutors that many similar type bank frauds, are committed by Nigerian nationals. I am unaware of participation by those of Liberians heritage prior to this case.

[2] Perhaps the use of the phrase in footnote 9 of the original submission that "the government has sought information from Mr. Morgan about the Nigerian individual" was an overstatement. In my conversation with Ms. McLeod, I do recall explaining that the only identifying or locating information about the organizer was available in Mr. Morgan's telephone that was already seized. I believe that I gave that information as a response to a questions. Perhaps a more appropriate statement was simply that I told the government that all the information Mr. Morgan had about the organizer was available on his telephone.

[3] If your Honor requests, I can forward a copy of the telephone calls by overnight mail or the government could provide a copy.

[4] Recording entitled USA0_001553.WMA at 8:20, 9:50.

In its submission, the government repeatedly sought to describe Mr. Morgan as having some authority and initiative that he clearly does not have. At page one of its submission, the government stated that "defendant and Kamara believed they had successfully bribed the UC...." This implies some type of authority on the part of the defendants. In the first paragraph of page 4 the government states that it was Mr. Morgan and Kamara who "sought assistance in stealing the funds" and that "the defendant realized his brazen scheme would not succeed without additional expertise. He then sought out the UC and offered to compensate the UC handsomely for assistance in stealing the funds."

First, it was the UC who called Mr. Morgan. I have repeatedly sought a response from the government as to how and why the UC received Mr. Morgan's telephone number in an attempt to confirm that it was likely the organizer or someone at the request of the organizer who had the UC call defendant as Mr. Morgan assumed. Further, in the January 5, 2019 recording (USA0_001553.WMA, at a little past 9:50) the UC told Mr. Morgan that his fee was 10% for him and 10% for "my buddy" who would participate.[5]

As for who made the determination how much money would be "stolen" from the account, one needs only to listen to the conversations between the UC and Mr. Morgan. In the January 5, 2019 conversation at about 14:20, when the UC first asked how much should be taken out of the three million dollars in the account at that time, Mr. Morgan suggests half. During the January 15, 2019 conversationwhen it was learned that there was $2.7 million in the account, the UC told Mr. Morgan that he will take 70% of the account balance. (USA0_001559.WMA at 5:10). Finally, on January 23, 2019 the UC said there was $2.6 million in the account and he "moved" $2.5 million. (USA0_001563.WMA at 1:02 to 1:30).[6]

---

[5] The UC then explained that he was going to get a burner phone because he didn't want to use his persona telephone. Mr. Morgan used his personal telephone. Kamara was arrested with two mobile phones.

[6] The government correctly notes that defendant "monitored" the account to see how much was in it. There was one recording in discovery of Mr. Morgan and Kamara calling the bank's telephone number to obtain the balance in the account. Mr. Morgan and Kamara could be heard whispering

Finally, and most telling, is that the defendants thought that the UC could simply request that the bank give them $2,500,000 in cash from the bank account (of a law firm!) just for the asking! No telephone confirmation, no in person request, no explanation - just here are two boxes of money.[7] And when discussing how Mr. Morgan would get the money back to Atlanta, the UC told him he can just take on the airplane with him because even if the TSA saw it "they don't care" about money traveling within the United States just if it leaves the country. and Mr. Morgan agreed![8] I have represented many people accused of bank frauds. Certainly there are frauds where cash is taken out from the bank, usually hundreds of dollars but on occasion thousands of dollars and even a few tens of thousands. Larger sums are always done by electronic transfers not cash withdrawals. USA0_001561.wma 4:25.

My discussion of Mr. Morgan's role in the offense, his obvious unfamiliarity of how such an offense could be committed, his complete trust and belief in what the UC claimed, was not to downplay the seriousness of large scale bank fraud or his own culpability. It was to demonstrate that Mr. Morgan should not be punished the same as those who have the skills and ability to commit such crimes. This is especially true when the government seeks a Guideline sentence when the Guidelines determination is so dominated by "intended loss" calculations. In this district there has been much criticism of overly harsh sentence calculations for fraud. *See e.g.* decisions by Judge Rakoff *United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y.2006), and *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012). The Second Circuit has permited Judge Rakoff and all other district courts to sentence offenders to a below Guideline sentence as a result of the manner fraud offenses are calculated. *See e.g. United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). [9]

---

to each other. See USA0_001554.opus

[7] The file USA0_001555.mov is a video taken by the UC and sent to the defendants showing two boxes of currency obtained from the bank.

[8] The UC told Mr. Morgan that the account would not be able to be accessed by anyone else for three days after he took the money so no one could find out about the theft for that period of time. It seemed like nonsense as explained by the UC but it was accepted by Mr. Morgan as fact.

[9] Pre-Booker cases discussed the availability of downward departures when the loss amount overstated culpability by putting undue weight on the loss. *See e.g. United States v. Emmenegger*,

Finally, I am struck by the total disregard of the conditions that presently exists in federal prisons nationwide as a result of the covid-19 pandemic in the government's submission. Not only are all inmates living in facilities that are ripe for exposure and it is clear that the Bureau of Prisons is under reporting those who have been infected, the conditions of confinement are much more restrictive and harsh under the protocols initiated by the Bureau. As of April 14, 2020 the MDC reports the following[10]:

Inmates tested: 11
Inmates positive: 5
Staff Positive: 14

There concept that only 5 inmates have the coronavirus when only 11 at tested is ludicrous. Many inmates have reported to their attorneys that if an inmate complains of symptoms, he is taken to the SHU. Few inmates have done so.[11]

There are severe limitations for all activities outside the inmates unit. Beyond the threat of illness and death from covid-19 itself, the psychological and emotional effects of incarceration during such a pandemic must not be ignored. Since it is clear that the limitations caused by the pandemic will continue for many more months, the psychological and emotional toll on inmates and staff will become worse. To ignore the difference of what it means to be imprisoned under the present and near future circumstances with pre-pandemic incarceration is wrong. Thus, a sentence within the Guidelines is much more than necessary to achieve the goals set forth under 18 U.S.C. § 3553.

---

329 F. Supp. 2d 416, 436 (S.D.N.Y. 2004); *United States v. McBride*, 362 F.3d 360 (6th Cir.2004); *United States v. Lauersen*, 348 F.3d 329 (2d Cir.2003). As Judge Lynch's decision in *Emmenegger so* elegantly suggests, issues concerning the blameworthiness of a defendant found guilty of fraud are more complex than simply measuring the amount of the loss. *Id.*

[10] Reports from MDC and MCC are required to be forwarded to Chief Judge Mauskopf every Tuesday and Friday. *See* https://www.nyed.uscourts.gov/coronavirus

[11] The are reports that contradict the official BOP reporting. *See e.g.* https://theintercept.com/2020/04/10/prison-coronavirus-mdc-bop/

Thank you for your Honor's consideration of this matter.

Very truly yours,

/s/
Sam A. Schmidt